*622 E. GRADY JOLLY, Circuit Judge:
This appeal presents questions relating to the dormant Commerce Clause and the Contract Clause of the United States Constitution. The district court granted a permanent injunction enjoining the implementation of La. R.S. § 42:802.1 (“Act 479” or “the Act”), on the basis that it violated the dormant Commerce Clause, because it effectively favored Louisiana insurance companies in bidding for health insurance coverage for state employees. However, the district court held that the Act did not violate the Contract Clause by interfering with the plaintiffs’ contracts with the State. Thus everybody now appeals something. Defendants, Angele Davis and Tommy D. Teague (the “State”),[1] and Intervenors, Vantage Health Plan (“Vantage”) and the Covered persons, appeal the permanent injunction and the ruling on the dormant Commerce Clause. Plaintiffs, United Healthcare Insurance Company (“UHC”) and Humana Insurance Company (“Humana”), cross-appeal the district court’s holding that the Act did not violate the Contract or Due Process Clauses. We conclude that the district court erred on both issues. Because the State, by choosing with whom it did business, was acting as a participant in — and not a regulator of — the insurance market, the Act fell within the market participant exception, and the dormant Commerce Clause was therefore not a bar to its actions. However, the Act was invalid, as applied, because it interfered with the plaintiffs’ current contracts in violation of the Contract Clause. Accordingly, we reverse the district court’s judgment in favor of the plaintiffs declaring the Act invalid under the Commerce Clause, vacate the district court’s permanent injunction enjoining implementation of the Act, and remand for further proceedings not inconsistent with this opinion.
I.
The State of Louisiana offers health care to its employees and retirees and their dependents (“enrollees”). The Office of Governmental Benefits (OGB), an executive branch state agency, arranges for the coverage of the State’s enrollees by contracting with health insurance companies; it also contributes approximately 75% of the premiums for its enrollees. In the past, the OGB has offered both self-funded/self-insured plans (those for which the OGB pays benefits itself and carries the risk of the claims) and fully-funded/fully-insured plans (those for which the insurance company pays the benefits and carries the risk of the claims). In 2006, the OGB undertook actuarial studies that indicated that the State would save significant costs by offering only self-insured plans (with the exception of a fully-insured Medicare plan for state retirees). Accordingly, in August of 2006 the OGB issued a Notice of Intent to Contract (NIC) to several health insurance firms seeking Administrative Services Only (ASO) contracts for its Exclusive Provider Organization (EPO) and HMO plans, and an NIC for a Medicare Advantage plan (MAPD). After the bidding process, OGB awarded an ASO contract to Humana for a self-insured HMO plan, and one to UHC for a self-insured EPO plan. It also awarded a separate contract to Humana to administer the MAPD plan. The ASO contracts were for one year (July 2007-July 2008) but included an option exercisable by OGB for two one-year renewals. The Humana MAPD agreement was for three years, to terminate in July 2010.
*623 Incorporated into each final agreement were the contract itself, the NIC, and the proposal submitted by the insurance company in response to the NIC. Under the contracts, the insurance companies were to provide services including enrolling participants, preparing and distributing informational materials to participants, issuing identification cards, determining claim eligibility and paying eligible claims, reviewing appeals and grievances, and reporting to the OGB. Among other administrative responsibilities, the insurance companies agreed to follow certain procedures for an annual enrollment period, the time during which employees could select their plans for the year, change their coverage, or add eligible dependents. The cost for the enrollment drive was to be paid by the insurance companies. Other than payment for services, OGB’s responsibilities included determining the eligibility of employees and regularly updating the insurance company with eligibility changes (which occurred due to an employee beginning or ending employment or acquiring a new spouse or dependent). The insurance companies were to be paid on a fee-per-covered-employee-per-month basis.
Vantage is a Louisiana HMO that in previous years had contracted with OGB to offer a fully funded HMO to state employees in one region of the state. When OGB decided to switch to only self-insured plans, Vantage did not submit a bid in response to the NIC because it could not offer self-insured ASO services. It wrote a letter to OGB requesting an NIC for a fully insured plan, but OGB declined to issue one.
Act 479 was signed into law in July, 2007. The Act mandates that the OGB solicit proposals in each region of the state from “Louisiana HMOs” and that the OGB must contract with any Louisiana HMO in each region (up to three) that submitted a “competitive” bid for a fully funded HMO plan. The Act defines a “Louisiana HMO” as one that
(1) Offers fully insured commercial and/or Medicare Advantage products; (2) Is domiciled, licensed, and operating within the state; (3) Maintains its primary corporate office and at least seventy percent of its employees in the state; and (4) Maintains within the state its core business functions which include utilization review services, claim payment processes, customer service call centers, enrollment services, information technology services, and provider relations.
La. R.S. § 42:802.1. It was enacted shortly after the beginning of the 2007-2008 fiscal year (which runs from July to July) but became effective for that fiscal year, and required that OGB hold an extraordinary enrollment period for the 2007-2008 year (in addition to the annual enrollment period that had already been held pursuant to its UHC and Humana contracts). The Act does not require the OGB “to utilize any insurance product that increases costs to the plan of benefits as determined by the independent actuarial process,” but requires that “the comparison shall be based on at least twelve months experience beginning no earlier than January 1, 2008.”
On August 1, 2007, as required by the Act, the OGB issued an NIC for a fully funded plan. The NIC was limited to Louisiana HMOs, though the Act did not require that it be so limited. Vantage submitted a bid in response to the NIC, but the parties never entered a contract. UHC and Humana filed federal suits seeking declaratory and injunctive relief, challenging the Act under the Commerce Clause, Contract Clause, and Due Process Clause of the federal Constitution; their suits were consolidated in the district court. Vantage then intervened, as did *624 four individuals (the “Covered Individuals”). The district court issued a Temporary Restraining Order (TRO) enjoining implementation of the Act, stating that it likely violated the Contract Clause. On October 31, 2007, after a hearing, the Court granted UHC’s and Humana’s motions for a permanent injunction, concluding that the Act violated the dormant Commerce Clause, but not the Contract or Due Process Clauses. Vantage and the Covered Persons (“Intervenors”) filed a Motion for New Trial or to Alter or Amend Judgment, which UHC and Humana opposed. The district court denied the Intervenors’ motions. The Intervenors and the State now appeal the district court’s determination that the Act violated the Commerce Clause. Humana and UHC cross-appeal the court’s determination that the Act did not violate the Contract or Due Process Clauses.
II.
We review the district court’s conclusions of constitutional law de novo, and any subsidiary factual findings for clear error. Allstate Ins. Co. v. Abbott, 495 F.3d 151, 160 (5th Cir.2007).
A.
We first address the plaintiffs’ appeal of the district court’s dormant Commerce Clause holding.[2] The Commerce Clause, U.S. Const, art. I, § 8, cl. 3, grants Congress the authority to regulate commerce among the states; the dormant Commerce Clause, which the Supreme Court has inferred from the text of the clause, prevents a state from enacting regulations that discriminate against out-of-state entities or burden interstate commerce. Granholm v. Heald, 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005). The Supreme Court has recognized an exception, however, when the state is acting as a market participant instead of as a market regulator. Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). Courts treat the question of whether the state is acting as a market participant as a threshold question for dormant Commerce Clause analysis. White v. Mass. Council of Constr. Employers, Inc., 460 U.S. 204, 210, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (“Impact on out-of-state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause.”).
 A state is a market participant if it is purchasing or selling a product or service; in such cases, it can choose its contracting partners as if it were a private party and can choose to deal preferentially with in-state entities. Hughes, 426 U.S. at 809-10, 96 S.Ct. 2488. A state may be acting as a market participant even when the effects of its actions extend beyond the privity of its own contracts (for instance, if it imposes conditions on the parties with whom it contracts) if it is expending its own funds to enter the contract and the conditions it imposes “cover[] a discrete, identifiable class of economic activity in which the [state] is a major participant.” White, 460 U.S. at 211 n. 7, 103 S.Ct. 1042. In White, the mayor of Boston issued an executive order requiring that all construction projects funded by the city be performed by at least half Boston residents. Although the order effectively imposed *625 conditions on contracts between contractors and their employees, the Court noted that “[e]veryone affected by the order is, in a substantial if informal sense, ‘working for the city.’ ” Id. The Court acknowledged that there were “some limits on a state or local government’s ability to impose restrictions that reach beyond the immediate parties with which the government transacts business,” but did not define those limits. Id.
Later cases have further defined the limits of the market participant exception. The exception does not automatically apply simply because a state participates in some way in the market it is otherwise regulating. For instance, in Wyoming v. Oklahoma, 502 U.S. 437, 456, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), the Supreme Court invalidated an Oklahoma statute that required that all Oklahoma electricity plants use at least 10% Oklahoma coal; the Court acknowledged that the state was a market participant in the coal market in that it purchased coal for its own plant, but held the statute was invalid because it also regulated private plants’ purchases. See also SSC Corp. v. Smithtown, 66 F.3d 502, 512 (2d Cir.1995) (“A state’s actions constitute ‘market participation’ only if a private party could have engaged in the same actions.”). Thus, a state cannot regulate others in the market in which it participates; the doctrine only protects the state’s participation itself.
Further, a state does not act within the market participant exception when its actions significantly affect markets other than the market in which it is a participant by imposing conditions on parties with whom it contracts. That is, the market participant exception does not allow a state to “impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of [the] particular market” in which it is a participant. South-Gentral Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 97, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). In South-Central Timber, Alaska attempted to sell timber subject to a requirement that the buyer agree to process the timber in Alaska. The Court held that although Alaska was acting as a seller in the timber market, its actions violated the dormant Commerce Clause because it was not a participant in the “downstream” market of timber processing. Id. at 95, 104 S.Ct. 2237. The Court noted that Alaska’s processing requirement went beyond normal commercial behavior, in that “the seller usually has no say over, and no interest in, how the product is to be used after the sale.” Id. at 96, 104 S.Ct. 2237. See also Nat’l Foreign Trade Council v. Natsios, 181 F.3d 38, 64 (1st Cir.1999) (“Under South-Central Timber, states may not use the market participant exception to shield otherwise impermissible regulatory behavior that goes beyond ordinary private market conduct.”). If the market participant exception allowed a state to impose conditions in any market tangentially related to the one in which the state participated, the Court noted, the exception would have “the potential of swallowing up the rule” imposed by the dormant Commerce Clause. South-Central Timber, 467 U.S. at 98, 104 S.Ct. 2237.
Here, the parties agree that Louisiana participates in the health insurance market by using its own funds to pay for its enrollees’ insurance and to contract with health insurance providers. UHC and Humana contend, and the district court held,[3] that the Act impermissibly goes beyond the health insurance market and regulates downstream markets in eus *626 tomer call centers, IT services, claim payment processing, and the other enumerated “core business functions” in which Louisiana is not a participant, by requiring a “Louisiana HMO” to maintain those business functions within the state.
We believe that the district court erred in its characterization and conclude that the Act falls within the market participant exception. First, the Act’s list of activities that must be performed in Louisiana does not constitute “regulation” at all; rather, the list is merely a definition of the State’s preferred contracting partners. Humana characterizes Louisiana’s requirements as imposing conditions on out-of-state insurance companies by forcing them to make significant changes in their operations in order to benefit from the Act. We do not think, however, that the purpose or effect of the Act is to force insurance companies to do anything at all. The in-state requirements are merely a definition of the State’s preferred contracting partners. The Act does not slightly suggest that, in making the definition so exclusive, the State seeks to make national insurance companies relocate their administrative services into Louisiana; to the contrary, the Act reflects an opposite legislative goal, that is, to assure that OGB (in contracting for state employees’ insurance) would have only to deal with home-grown companies like Vantage.[4] Further, unlike in Southr-Central Timber, where the state required a timber buyer “to deal with a stranger to the contract after completion of the sale,” Louisiana’s requirements apply only for the duration of the State’s contracts; that is, they apply only while the State, as a participant in the market for insurance contracts, “retain[s] a continuing proprietary interest in the subject of the contract.” Southr-Central Timber, 467 U.S. at 96, 99, 104 S.Ct. 2237. The Act’s definition of a “Louisiana HMO” simply does not have characteristics of a regulation.[5]
Second, the Act does not have a regulatory effect on a market downstream from the market in which the State participates. The only markets affected by the Act are those for services that the contracts explicitly require the insurance companies to perform; they are the very “administrative services” of the Administrative Services Only contracts. Each of the “core business functions” listed in the Act is expressly referenced in the contracts or in the NIC. In Southr-Central Timber, Alaska argued that it participated in the “processed timber market” by selling timber that would later be processed; however, it “acknowledge^] that it participate[d] in no way in the actual processing.” South-Central Timber, 467 U.S. at 98, 104 S.Ct. *627 2237 (emphasis added). Here, Louisiana does participate directly in the markets for call centers, IT services, claims processing, and other administrative services: it has contracted to purchase those services from Humana and UHC. The “downstream market” doctrine is therefore inapposite.
Accordingly, we conclude that the Act falls within the market participant exception and does not violate the dormant Commerce Clause.
B.
We turn now to UHC and Humana’s cross-appeal. As we have earlier indicated, the district court held that the Act violated the dormant Commerce Clause, but that it did not violate the Contract Clause. Now that we have revived the Act under the dormant Commerce Clause, we must determine whether it also survives under the Contract Clause.
The Contract Clause prohibits states from passing any law that “impair[s] the Obligations of Contracts.” U.S. Const, art. I, § 10. To determine whether a state law has impaired its own contractual obligations for the purposes of the Clause, we apply the Supreme Court’s three-step analysis. First, we must determine whether the law substantially impaired a contractual relationship with the state.[6] Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Second, if so, we examine the state’s asserted justification for the impairment, which must be a significant and legitimate public purpose. Third, if the public purpose is adequate, we ask whether the challenged law was “reasonably necessary” to achieve the purpose. Id. at 412-13, 98 S.Ct. 2716. We do not defer completely to the legislature’s judgment because of the possibility that the state is acting in its own self interest regarding the contract. U.S. Trust Co. v. New Jersey, 431 U.S. 1, 25-26, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).
1.
An important consideration in our substantial impairment analysis is the extent to which the law upsets the reasonable expectations the parties had at the time of contracting, regarding the specific contractual rights the state’s action allegedly impairs.[7] Lipscomb v. Columbus Mun. Separate Sch. Dist., 269 F.3d 494, 506 (5th Cir.2001). “[L]aws which subsist at the time and place of the making of a contract ... enter into and form part of it,” U.S. Trust, 431 U.S. at 19 n. 17, 97 S.Ct. 1505, but the court also “should con *628 sider the expectations of the parties with respect to changes in the law.” Lipscomb, 269 F.3d at 504. “[T]otal destruction of contractual expectations is not necessary for a finding of substantial impairment.” Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 412, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). However, a law that “technically alter[s] an obligation of a contract” does not substantially impair it if the alteration merely “restrict[s] a party to those gains reasonably to be expected from the contract.” City of El Paso v. Simmons, 379 U.S. 497, 515, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). To determine whether an impairment was substantial, the Supreme Court has considered “factors that reflect the high value the Framers placed on the protection of private contracts,” namely, the parties’ entitlement to rely on rights and obligations set by the contract so that they can “order their personal and business affairs according to their particular needs and interests.” Allied Structural Steel, 438 U.S. at 245, 98 S.Ct. 2716. In Allied Structural Steel, the Court found that the state had impaired a private contract when it “superimposed pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake.” Id. at 240, 98 S.Ct. 2716. The Court considered that the parties “had no reason to anticipate” the new obligations, that they had relied on their previously contracted obligations for ten years, and that the challenged law “chang[ed] the company’s obligations in an area where the element of reliance was vital — the funding of a pension plan.” Id. at 246, 98 S.Ct. 2716.
Courts look to terms of the contract to determine the parties’ reasonable expectations, including whether the risk of a change in the law was contemplated at the time of contracting. Energy Reserves Group, 459 U.S. at 414-16, 103 S.Ct. 697. In Energy Reserves Group, the Court upheld a Kansas statute imposing price controls on natural gas. The Court considered that not only was the natural gas market heavily regulated at the time the parties entered the contract, but the contract itself included terms that adjusted for changes in gas price regulation, so the parties must have known that their “contractual rights were subject to alteration by state price regulation.” Id. at 415-16, 103 S.Ct. 697.
Here, the district court gave two reasons for its conclusion that the Act did not violate the Contract Clause. We conclude that its first reason — that the contracts were terminable at will by OGB — does not prevent a finding of contract impairment. The court seemed to assume, without explanation, that the power to terminate the contracts at will necessarily includes the lesser power to impair those contracts, and that therefore these contractual powers meant that OGB could modify its obligations and those of the plaintiffs without violating the Contract Clause. However, neither the district court nor the parties point to any authority that supports the proposition that the power to terminate a contract enfolds the power to impair it for the purposes of the Contract Clause.[8] Because the Act did not terminate the contract, as the OGB had reserved the right to do, but instead made the plaintiffs’ obligations more onerous, the termination clauses do not save the State from Contract Clause scrutiny.
*629 Second, the district court found that no provision of the contracts guarantees exclusivity to any of the plaintiffs and thus concluded that the State’s allowing additional plan options, in a new bidding process, could not impair any right or obligation under such contracts. The plaintiffs contend that the contracts’ lack of “exclusivity” is irrelevant in determining whether these contracts were impaired. It may be true, they argue, that each plaintiff knew that it would not be the only carrier with an ASO contract and that enrollees would choose between four types of plans; however, both parties expected, and were effectively assured, that the number of plans would be limited to those in the 2007 NICs. Instead, the Act introduced the possibility that enrollees would choose from five or more plans, up to nearly thirty. This increase of available choices would have the effect of decreasing each company’s number of enrollees. Further, the plaintiffs point out that the court did not address the plaintiffs’ showing that the addition of an extraordinary enrollment period imposed unexpected costs associated with the process of conducting a new enrollment drive. In short, the plaintiffs conclude, the district court’s reliance on the lack of exclusivity in the plaintiffs’ contracts is legally insufficient for its determination that UHC and Humana’s contracts were not substantially impaired by the Act.
We agree that the district court erred in its analysis of the Contract Clause. Our review of the record indicates that the Act impairs Humana’s and UHC’s contracts in two substantial ways.[9] First, the record does in fact establish that, in conjunction with the NICs, the contracts effectively assured that no new plans would become available for the 2007-2008 year. This contractual expectation is further demonstrated by the Louisiana Attorney General opinion issued in response to a request from Vantage: “OGB is bound by the terms of the NIC” and “any contract that falls within the scope of the NIC must be awarded according to the terms of the NIC.” Op. No. 07-0063. The AG does not opine whether an NIC for a fully insured HMO would fall within the scope of the earlier ASO NIC, but OGB itself determined that it would, and consequently OGB could not lawfully solicit bids for fully insured HMO plans for the 2007-2008 year without breaching its contracts.[10]
We thus can see that UHC, Humana, and the State, that is, the parties to the contracts, all had the same understanding as to the effect of the contracts and the NIC. They understood that the type and number of plans available to enrollees for that year would be limited to those sought in the NIC. This understanding is bolstered by the State’s confirmation in a formal Q&A session — prior to the letting of the contract — that no fully funded plans would be offered alongside the self-funded plans. The plaintiffs relied on that expectation when they calculated their bids and signed contracts, all with the understanding that once the bids were let, the competition for enrollees would be between four plans: one EPO, one PPO (administered *630 by the state), one HMO, and one Medicare plan (for retirees).[11] Unlike in Energy Reserves Group, nothing in the contracts indicates that the parties understood that there was a possibility that the landscape of plan options was subject to change.[12] See Energy Reserves Group, 459 U.S. at 414-16, 103 S.Ct. 697.
Second, the Act interferes with Humana’s and UHC’s contracts by mandating an unexpected and extraordinary enrollment period in the middle of the contract year. The contracts and the NIC provide for a single annual enrollment period and list the insurance companies’ obligations regarding the enrollment drive. But the Act mandates an additional “extraordinary” enrollment period to allow enrollees to choose any new plan options offered by Louisiana HMOs. The insurance companies had accounted for the cost of one enrollment drive in their bids (estimated as approximately $300,000); thus, paying for another, unexpected enrollment drive would offset their expected returns from the contracts in a way that was not foreseeable when the contracts began.
These impairments are substantial and disrupt the purpose of the contracts at issue here; that is, to allow the parties to rely on their contractual expectations of approximate numbers of enrollees and the approximate expense of administering the plans. By entering into contracts with the OGB the plaintiffs specifically intended to foreclose the risks of undergoing an additional enrollment period and having to compete for enrollees with unexpected additional plans. Avoiding these risks allowed the companies to plan for the year ahead financially, and to enter into other agreements (for instance, with providers in their networks). The Act’s spoiling of the parties’ contractual expectations regarding these risks is the type of impairment that the Contract Clause prohibits. See Allied Structural Steel, 438 U.S. at 245, 98 S.Ct. 2716.
2.
Because we have concluded that the Act substantially impaired UHC’s and Humana’s contracts, we must next examine whether the impairment was justified. The district court did not address the second and third prongs of the Contract Clause analysis because it concluded that the plaintiffs failed to meet the first prong of the test. The record before us, however, is sufficient to allow us to conclude as a matter of law that the State lacked adequate justification for the Act. We therefore need not reach the third prong of the analysis (whether the impairment was reasonably necessary), and we conclude that the Act violates the Contract Clause.[13]
To justify impairing a contract with the state, the law’s public purpose *631 must be one that implicates the state’s police power, such as by remedying a “broad and general” social problem. Lipscomb, 269 F.3d at 504-05. Providing a benefit to a narrow group or special interest is insufficient justification. Id. To this point: In Allied Structural Steel, the challenged Minnesota law was enacted when a division of a large motor company closed its Minnesota plant and attempted to terminate its pension plan, which would have financially harmed its terminated employees in that state. 438 U.S. at 247-48, 98 S.Ct. 2716. The statute imposed a “pension funding charge” on certain, narrowly defined employers who terminated their pension plan or closed a Minnesota office. Id. at 238, 98 S.Ct. 2716. The Court noted that the statute applied only to very few employers, and only in very rare situations, and concluded that the law “can hardly be characterized ... as one enacted to protect a broad societal interest rather than a narrow class.” Id. at 249, 98 S.Ct. 2716.
Justifications for contractual impairments that the Supreme Court has found to be acceptable have been exercises of the state’s sovereign authority to protect its citizens and prevent abuses of its contracts. See, e.g., Home Building & Loan Ass’n v. Blaisdell, 290 U.S. 398, 445, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (upholding a statute altering the terms of mortgages in response to “an economic emergency which threatened the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence”); Energy Reserves Group, 459 U.S. at 416-17, 103 S.Ct. 697 (“Kansas has exercised its police power to protect consumers from the escalation of natural gas prices caused by deregulation.”); City of El Paso, 379 U.S. at 511-14, 85 S.Ct. 577 (upholding a statute that rescinded prior contracts when the statute’s purpose was to remedy widespread abuse of those contracts).
In this case, the record indisputably demonstrates that the Act is narrowly focused on benefitting in-state HMOs (indeed, a specific one) and is not a broad exercise of the State’s police power. The representative who drafted the bill met only with the President and CEO of Vantage for input. The law applies only to a narrow class of HMOs that operate almost entirely within Louisiana. OGB noted in a veto letter to the governor that “the legislature has neither formulated nor articulated a statement of public policy” on the bill. The Act was proposed in response to the OGB’s decision to stop offering a fully insured HMO, and, more directly, in response to the failure of Vantage’s efforts to convince the OGB to offer it a contract.
Given the State’s burden to justify its impairment of its own contracts, from the face of the Act, the events surrounding its enactment, and from its effect we cannot accept the State’s assertions about justifications other than economic protectionism. The district court concluded (in its Commerce Clause analysis) that the Act was enacted for economic protectionism purposes. The State has failed to meet its burden to produce evidence supporting any other justification. Further, any impairment to the plaintiffs’ contracts was caused by the timing of the implementation of the Act’s requirements, which were to be effective while the plaintiffs’ contracts were still in effect. The State has not made any effort to explain or justify this timing. Cf. Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 733, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). In sum, we conclude that the Act violates the Contract Clause insofar as it is effective during the course of the plaintiffs’ contracts.[14]
*632 C.
The plaintiffs’ substantive due process claim mirrors their Contract Clause argument; they argue that the Act interfered with substantially the same rights in the contract that it impaired for purposes of the Contract Clause. Because we have concluded that the Act is void under the Contract Clause, we will not address the Due Process claim.
III.
For these reasons, we conclude that the Act does not violate the dormant Commerce Clause. The Act, as applied to the contracts before us, does violate the Contract Clause and therefore is invalid as applied. The judgment of the district court declaring Act 479 to be unconstitutional as a violation of the Commerce Clause is REVERSED and the judgment of the district court permanently enjoining the implementation of Act 479 is VACATED. We REMAND for further proceedings not inconsistent with this opinion.

. Tommy Teague is the CEO of the Office of Governmental Benefits and Angele Davis is the Commissioner of Administration; both were sued in their official capacities.

. Although, as discussed in Part II.B. below, we conclude that the Act violates the Contract Clause of the Constitution, the Contract Clause conclusion is time-sensitive because the relevant contracts will expire soon after this opinion issues. Therefore, we address the plaintiffs’ Commerce Clause challenge as well.

. The district court did not address the market participant exception in its original ruling, but did so in its ruling on the Intervenors’ motion for a new trial.

. The Seventh Circuit has rejected an argument similar to the plaintiffs’, upholding a local business preference that gave local bidders a 2% advantage over nonlocal bidders. The court noted that the plaintiff was "free to contract with other parties without being subject to the local business preference,” and thus was not "required” to do anything by the regulation. J.F. Shea Co. v. Chicago, 992 F.2d 745, 748 (7th Cir. 1993).

. We would not allow a state to use a purported "definition” to impose de facto regulation that would violate the dormant Commerce Clause. For instance, if in South-Central Timber Alaska had said that it would only do business with "in-state” purchasers, and had defined "in-state” purchasers as those that processed timber within Alaska, the Supreme Court easily would have seen through the state's wording and struck down the law as an improper regulation of conduct. Different phrasing would not have allowed Alaska to avoid the fact that it was fundamentally requiring timber purchasers to act in a certain way and that its requirement significantly impacted a market in which the state did not participate. Here, on the other hand, the fundamental nature of the Act's requirement is as a definition; no party (other than the OGB) will change its behavior because of it.

. Our analysis assumes, as the parties do, that the relevant contract is with the state. The standard is different when the state law interferes with purely private contracts (which would be the case if the Act interfered with the contracts between the insurance companies and their enrollees).

. The State relies on Charles River Bridge v. Warren Bridge, 36 U.S. 420, 11 Pet. 420, 9 L.Ed. 773 (1837), to argue that the subject obligations in state contracts must have been explicit in order to find a violation of the Contract Clause. But in Charles River Bridge, the Court's analysis was not based on the Contract Clause; it was based on the unmistakability doctrine; that is, the rule that “in grants by the public, nothing passes by implication.'’ Id. at 546. More recently, the Court has held that the unmistakability doctrine is not applicable to “humdrum supply contracts,” which do not implicate limitations on sovereign authority. United States v. Winstar Corp., 518 U.S. 839, 880, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). A state cannot "bargain away” its police power, and therefore the Contract Clause is inapplicable if the contract "surrender[s] an essential attribute of [the state's] sovereignty.” Lipscomb, 269 F.3d at 505. But the contracts here were for run-of-the-mill administrative services for a limited duration; the State’s primary responsibility was financial, and the State does not contend that the contracts limited its sovereign authority. Charles River Bridge and the unmistakability doctrine are therefore inapposite.

. The only case cited by Vantage for that proposition, Dartmouth College v. Woodward, 17 U.S. 518, 712, 4 Wheat. 518, 4 L.Ed. 629 (1819), actually only held that the state legislature could not take away powers granted in the state's corporate charter for Dartmouth, which the court determined was a contract, when the power to do so was not reserved in the grant.

. Because of the delay between the Act's original enactment and this opinion, the effect of lifting the district court's injunction at this point would be slightly different from the effect of the Act if it had been implemented in 2007. However, because the relevant contracts have been extended and are in effect for several more months, we conclude that the Act continues to substantially impair those contracts.

. OGB stated at the time that any contract for a fully-insured HMO Plan would "provide the very services sought in the [August 2006] NIC." Further, the OGB considered the Act an attempt to "circumvent” its contracts with the plaintiffs.

. Humana explains the importance of that expectation: the resulting loss of enrollees would lower the companies’ revenue from the contracts because the insurance companies are paid per enrollee, and providers in Humana's plan network will terminate or renegotiate their contracts with Humana based on the lower number of participants in the plan.

. Vantage and the State rely on contractual provisions allowing for changes in the number of enrollees to argue that the plaintiffs foresaw a possible loss of enrollees. These provisions, however, only reflect the relatively small shifts in enrollees that occur when employees change jobs or acquire new family members.

. See also Matter of Tex. Extrusion Corp., 844 F.2d 1142, 1156 (5th Cir.1988) ("Although the district court did not reach the merits of appellants' challenge of the order approving the Disclosure Statement, considerations of judicial economy convince us to address these issues in this appeal.”). The pull of judicial economy is especially strong here because delaying a decision on the merits would not permit the parties to adjust their behavior according to our decision by the time their annual contracts are arranged in April.

. Although the point is obvious, we should note that our holding concerning the Contract *632 Clause does not address the effect of the Act on any contracts except those before us today.