# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-31255

United States Court of Appeals
Fifth Circuit

**FILED**

December 9, 2015

Lyle W. Cayce
Clerk

ROBERT C. JONES, III,

      Plaintiff - Appellant

v.

LOUISIANA BOARD OF SUPERVISORS OF UNIVERSITY OF LOUISIANA
SYSTEMS; STATE OF LOUISIANA; LISA ABNEY; RANDALL WEBB;
ROBERT CREW; CARL JONES; MARCUS JONES; JERRY PIERCE;
DARLENE WILLIAMS,

      Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana
USDC 1:11-CV-1359

Before STEWART, Chief Judge, and JONES and GRAVES, Circuit Judges.

PER CURIAM:[*]

    Plaintiff Robert C. Jones III ("Jones") was a tenured economics professor at Northwestern State University ("NSU"), a division of the University of Louisiana System ("ULS"). Beginning around 2008, the Louisiana legislature enacted heavy budget cuts that seriously impacted the state's public

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-31255

universities. In 2010, NSU administrators tasked with reducing the university's budget eliminated the "economics concentration" at NSU and terminated Jones's tenure. He subsequently brought this 42 U.S.C. § 1983 suit against the State of Louisiana, the ULS Board of Supervisors, NSU President Randall Webb ("Webb"), and NSU Provost and Vice President for Academic Affairs Lisa Abney ("Abney") (collectively, "Defendants"). Jones alleged that Defendants violated his procedural and substantive due process rights, as well as the Contracts Clause of the U.S. Constitution.[1] The district court granted summary judgement to all Defendants. We AFFIRM.

## I. BACKGROUND

Viewing the facts in the light most favorable to Jones, NSU hired him in 1994 as an instructor to teach in the College of Business. In 2000, Jones was promoted to associate professor in the College of Business and granted tenure. During his time at NSU, Jones primarily taught basic micro- and macro-economics courses, but he sporadically taught a variety of finance courses as well.

ULS bylaws state that tenure "shall be granted and held only within an academic discipline that is offered at the institution and assures renewed appointments only within that discipline." The official documents that Jones contends vested him with tenure do not reference the discipline in which he was tenured. The bylaws also state that "[t]enure assures the faculty member that employment in the academic discipline at the institution will be renewed annually until the faculty member resigns, retires, or is terminated for cause or financial exigency." The term "cause" is defined to include "conduct seriously prejudicial to the college or university system" as well as financial exigency. A

---

[1] Jones brought other claims and originally sued other defendants, but he has abandoned these other claims on appeal and voluntarily dismissed the other defendants.

catchall clause follows: "The foregoing enumeration of cause shall not be deemed exclusive. However, action to discharge, terminate, or demote shall not be arbitrary or capricious, nor shall it infringe upon academic freedom."

Beginning around 2008, NSU faced deep budget cuts that required university administrators to begin reducing expenditures by consolidating colleges and schools, discontinuing academic programs, and terminating employees. Budget documents from June 2010 indicated that NSU's state appropriations were trending downward rapidly, from about $49 million in FY 2008, to a projected $41 million in FY 2010 and a projected $31 million in FY 2011.[2] In the summer of 2009, Provost Abney began to hold meetings with the Program Review Committee, a group composed of representatives from NSU's colleges and faculty senate. The committee was charged with selecting programs for discontinuance, employing criteria outlined in a ULS policy memorandum. That memorandum dictated certain rights due to tenured faculty terminated because of the discontinuation of their program: (1) "every reasonable effort" would be made to find them a "suitable position . . . within the university" and (2) non-tenured faculty members would be "considered for termination" before those with tenure, absent a "compelling academic reason to do otherwise."

Between 2009 and 2010, the committee suggested the elimination of certain programs. The committee's final proposed list did not include the economics concentration. Recognizing that the list was insufficient to address the depth of the budget reduction, Abney consulted with a wide variety of ULS and NSU officials, including college deans and legal counsel, to find other areas

---

[2] The final state appropriation amounts were ultimately altered somewhat due to factors like mid-year budget reductions and federal stimulus money. Despite these budget shortfalls, Defendants do not appear to rely on financial exigency—a term of art—to justify Jones's termination.

No. 14-31255

to cut. In June 2010, Abney began a discussion with the College of Business dean about the economics concentration because, according to her affidavit, "it had a high cost," and "had graduated few students in past years."

At the time of Jones's hiring at NSU, the university offered an economics minor degree; in 2006, however, that minor was discontinued and replaced by the economics concentration. NSU records indicate that although three professors were teaching economics courses, only three students had apparently ever signed up for the economics concentration. However, the basic macro- and micro-economics courses were and continue to be prerequisites for degrees in business administration. NSU projected savings of $145,061 by eliminating the economics concentration, due entirely to the removal of the three faculty members, two of whom were tenured, including Jones. Viewing the facts in the light most favorable to Jones, all of the economics courses that he once taught continue to be taught, though by non-tenured faculty; the courses are also now housed in the social science college instead of the business college.

On June 16, 2010, NSU President Webb wrote to the President of the ULS that nine degree programs, five concentrations (including the economics concentration), and 12 minors should be discontinued. The ULS Board of Supervisors subsequently ratified Webb's plan. On June 17, Abney wrote to the three economics faculty to invite them to President Webb's office the following day "for an appointment to discuss the Economics concentration." The meeting, which Jones attended, was approximately 20 minutes long. The parties agree that there was a discussion about the elimination of the economics concentration, but Jones disputes that he understood this to signify that his tenure, too, would be terminated.

Jones's tenure was formally terminated by a letter drafted by Abney on July 22, 2010. In the letter, Abney wrote that the "ULS Board approved the

No. 14-31255

discontinuance of the concentration in which you currently teach." The letter stated that a review of Jones's credentials demonstrated that there was "either not a position to which you can be moved in another department, or your credentials prevent you from being relocated to another position outside your original discipline." (NSU had a general policy to only credential faculty if they had graduate degrees in the relevant discipline, or at least 18 graduate hours in that discipline, based on guidelines promulgated by the Southern Association of Colleges and Schools.) Jones's tenure, the letter continued, would last through July 31, 2011. He was offered—and subsequently accepted—a position as an "instructor" for a salary of $35,000, about half of what he had been making before.

Jones appealed to a committee comprising seven faculty members, including one faculty member from the College of Business. Jones drafted a seven-page letter to the committee outlining substantially the same arguments that he made to the district court and in this appeal. He did not appear before the committee and was not represented by counsel.[3] On November 5, 2010, the committee unanimously rejected Jones's appeal.

Jones subsequently brought this suit in the district court on July 22, 2011, seeking reinstatement and damages. The district court determined that sovereign immunity insulated the State of Louisiana and the ULS Board of Supervisors from liability, and that qualified immunity applied to the claims

---

[3] Jones now alleges that the committee "permitted an appeal only of the program discontinuance and not of tenure." Committee minutes reveal, however, that the committee was instructed by legal counsel that it was "not reviewing the program, but reviewing the individual." The committee chairman in deposition testimony also indicated that there was individualized consideration of the claims in Jones's appeal letter. That said, Defendants' response to Jones's statement of material facts states that the "Committee determined whether or not the program had sufficient numbers in support to be continued or should remain eliminated due to the budgetary constraints." Viewing the facts in the light most favorable to Jones, this statement is better aligned to his understanding of the committee's responsibilities.

against Webb and Abney in their individual capacities because the decision was objectively reasonable in light of NSU's severe budget crisis.[4] The district court concluded that only "the barest procedural protections of notice and an opportunity to be heard" are applicable in the context of a tenure termination following a program-elimination decision. Reciting the extensive internal review of the decision to eliminate the economics concentration and Jones's lack of credentials outside of economics, the district court concluded that "NSU provided Jones with at least the Constitutionally-required minimum process of notice and an opportunity to be heard. In fact, the evidence in the record suggests he was afforded more than that." Finally, the district court stated that its due process analysis foreclosed Jones's Contracts Clause claim and other claims not relevant in this appeal. Consequently, the district court granted Defendants' motion for summary judgment, denied Jones's motion for partial summary judgment, and dismissed the suit with prejudice.

Jones timely appealed, raising both procedural and substantive due process claims and a violation of the Contracts Clause of the U.S. Constitution. Jones primarily argues, relying on *Texas Faculty Association v. University of Texas at Dallas*, 946 F.2d 379 (5th Cir. 1991), that he was entitled to a hearing on his individual termination before President Webb, the ultimate decision-maker.[5] He also contends that his firing was arbitrary and capricious. Defendants rely heavily on the budgetary problems faced by NSU and vacillate

---

[4] Jones did not brief sovereign immunity on appeal and has therefore waived any argument that the ULS Board of Supervisors or the State of Louisiana can be held liable in this suit. *See Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 232 (5th Cir. 2004).

[5] Defendants contended at oral argument that, in fact, the ULS Board of Supervisors—rather than President Webb—was the final decision-maker. They conceded, however, in response to Jones's statement of material facts supporting his partial summary judgment motion, that Webb was the ultimate decision-maker. We assume for purposes of deciding this case that Webb was the ultimate decision-maker.

No. 14-31255

between arguing that Jones was not even entitled to a hearing and contending that the requisite process was provided.

## II. Standard of Review

Appellate review of a district court's grant of summary judgment is de novo. *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 895 (5th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. Procedural Due Process

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Where a tenured public university faculty member is terminated, due process requires both notice and an opportunity to be heard. *See Tex. Faculty*, 946 F.2d at 384; *Russell v. Harrison*, 736 F.2d 283, 289 (5th Cir. 1984). In this case, it is effectively conceded by Defendants that Jones had a protected property interest in his continued government employment. *See Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972). It is likewise conceded by Jones that he was provided constitutionally adequate notice. Thus, the only remaining question with respect to procedural due process is whether Jones was provided an adequate hearing.

The type of hearing necessary—the process due—is a function of the context of the individual case. Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal quotation marks and citation omitted). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Sys. Contractors Corp. v. Orleans Par. Sch. Bd.*, 148 F.3d 571, 575 (5th Cir. 1998). To determine the requisite process, a court must

7

analyze the "interests at stake in a given case." *Babin v. Breaux*, 587 F. App'x 105, 110 (5th Cir. 2014) (per curiam) (citing *Mathews*, 424 U.S. at 334–35). *Mathews* provides the three distinct interests to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

Jones principally argues—relying on *Texas Faculty*, 946 F.2d at 387–89, and *Russell*, 736 F.2d at 289—that he was entitled to a face-to-face hearing before NSU President Webb, the ultimate decision-maker. Defendants argue that no hearing was necessary, and alternatively that adequate procedures were employed because NSU adhered to the program discontinuance policy and provided Jones an appeal before a faculty committee. They also argue that the court must defer to NSU's interest in addressing its fiscal emergency.

Jones's private interest in retaining his government employment was significant. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) ("[T]he significance of the private interest in retaining employment cannot be gainsaid."); *Tex. Faculty*, 946 F.2d at 384. It takes on perhaps added significance because Jones had been a tenured teacher at NSU for a decade and had a reasonable expectation of ongoing employment.

The risk that a particular faculty member will be terminated erroneously under the challenged post-deprivation proceedings, however, is not substantial. With respect to the unchallenged, but related, decision to eliminate programs like the economics concentration, there were multiple tiers of review, as the district court noted. The Program Review Committee selected most programs that were discontinued. Webb and his cabinet met regularly to

discuss the budget crisis and address the committee's recommendations. And Webb's recommendations were reviewed by the ULS Board of Supervisors. The post-deprivation proceedings addressed to Jones's specific tenure termination were thinner, and posed a slightly greater threat of erroneous deprivation. The central procedural safeguard was the appeal hearing before the committee of seven faculty members. Jones had the opportunity to present an extended explanation via letter to the committee, which included attached documentation and a supporting affidavit from a retired College of Business administrator and professor. Jones does not contend that the committee members were biased or unqualified.[6]

The central additional process to which Jones claims he was entitled is a "face to face meeting with the ultimate decision maker," President Webb. This additional procedural safeguard seems unlikely to provide much further protection from an erroneous decision. Though both cases involved pre-deprivation due process issues, a brief comparison between *Goldberg v. Kelly*, 397 U.S. 254 (1970), which required a face-to-face hearing, and *Mathews*, 424 U.S. at 343–46, which did not, is illustrative.[7] The *Goldberg* Court determined that an individual whose welfare benefits are terminated is entitled to a face-to-face, pre-termination hearing. *See* 397 U.S. at 268–69. This decision was in

---

[6] Jones argues that the committee could not address his individual termination, but only the elimination of the economics concentration. The record reveals, however, that the committee did evaluate Jones's particular circumstances and qualifications. Even if the committee had no power to correct his termination (outside of reinstating the program), Provost Abney and at least one other NSU official communicated with Jones about his qualifications and whether NSU could find an adequate position for him. Due process does not require exclusively formal opportunities to challenge a deprivation of property. *See Tex. Faculty*, 946 F.2d at 389 ("In most faculty-termination cases, the aggrieved instructor was afforded a relatively formal procedure as a matter of state law or institutional policy. We believe that the due process clause, of its force, requires little formality.").

[7] The *Mathews* test derived from the *Goldberg* decision, *see Mathews*, 424 U.S. at 335, and is applicable both to pre- and post-deprivation hearings. *See Tex. Faculty*, 946 F.2d at 384–86 (applying *Mathews* in post-deprivation context).

part based on the likely "educational attainment" of welfare recipients and the "credibility and veracity" issues inherent in the welfare decision-making context. *Id.* at 269. In *Mathews*, which held that no face-to-face, pre-deprivation hearing was compulsory in the context of disability benefits termination, the Court noted that most disability cases will turn on "routine, standard, and unbiased medical reports by physician specialists." 424 U.S. at 344 (internal quotation marks and citation omitted).

The termination decision here resembles more closely the disability benefits determinations in *Mathews* than the welfare benefits determinations in *Goldberg*. Decision-makers in the tenure termination context look to accreditation, academic transcripts, tenure documents, bylaws, and university policies, much like the documents relied upon in the disability context. *See Mathews*, 424 U.S. at 344–45. It is difficult to see exactly where veracity or credibility would come into play in a faculty termination decision unrelated to the teacher's actions, and certainly the "educational attainment" dilemma in *Goldberg* that bolstered the justification for the in-person hearing is inapplicable to Jones, who has a Ph.D., and other educated university faculty.

Finally, looking to the government's interest and the burden imposed by any suggested additional procedural safeguards, there can be little doubt that Defendants have a robust interest in maintaining the fiscal integrity of the public university system. *See Williams v. Tex. Tech. Univ. Health Scis. Ctr.*, 6 F.3d 290, 293 (5th Cir. 1993) (citations omitted) ("A state university has a significant interest in having reasonable discretion to administer its educational programs."). "The strength of that interest gives schools leeway in making broad budget decisions that may affect only a few employees." *Id.*; *see also Tex. Faculty*, 946 F.2d at 387–89; *Wilson v. Louisiana*, No. 11–1388, 2014 WL 1788283, at *8 (W.D. La. May 5, 2014), *aff'd*, 597 F. App'x 796 (5th Cir. 2015) ("The government has an equally important interest in ensuring the

continuation of its institutions by making difficult decisions regarding program cuts."). Further, "federal courts . . . have been reluctant to impose due process requirements on public colleges and universities when doing so might compromise the state's ability to administer them effectively." *Tex. Faculty*, 946 F.2d at 385; *see also Bd. of Curators v. Horowitz*, 435 U.S. 78, 91 (1978); *Levitt v. Bd. of Trs.*, 376 F. Supp. 945, 950 (D. Neb. 1974).

As to the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail," *Mathews*, 424 U.S. at 335, it seems certain enough that providing every employee of a university an opportunity to meet with the ultimate decision-maker when their termination is the result of a budget crisis would produce a serious administrative, if not fiscal, burden. *See Babin*, 587 F. App'x at 111 ("Requiring that, in a layoff situation, each laid off employee be afforded an opportunity to meet with the final decision maker and dispute his selection for the layoff, the policies underlying the layoff, and the evidence and research underlying those policies, would be burdensome in the extreme, and it is difficult to see here what additional value such a meeting would bring."); *cf. Sys. Contractors*, 148 F.3d at 576 (holding that a public entity's failure to provide a transcript of hearing proceedings "would not lessen the probability of an erroneous deprivation" because the "bulk of the evidence in this case is documentary evidence").

The process provided to Jones met the constitutionally mandated minimum requirements for due process. Jones's interest in retaining his tenure was substantial. *See Loudermill*, 470 U.S. at 543. Defendants, however, had a considerable interest in cutting staff in order to preserve the fiscal integrity of the ULS system and NSU in particular. *See Williams*, 6 F.3d at 293. Although NSU apparently did not declare a financial exigency, the system-wide budget cuts were considerable, and required immediate, significant changes to the structure of public universities in the state. The

district court properly showed deference to that weighty interest. Jones had an opportunity to make his case on appeal to an impartial panel of his peers (including one professor from the College of Business), and directly to officials including Provost Abney. Buttressing our conclusion is the probable futility of—and administrative burden associated with—the additional procedural safeguard Jones proposes: a hearing before NSU's president. *See Babin*, 587 F. App'x at 111 (noting that such an opportunity to meet with a "final decision maker" for all employees in a layoff situation "would be burdensome in the extreme").

Finally, the process afforded Jones comports with established rules for handling tenure termination. *See Tex. Faculty*, 946 F.2d at 388 ("Initially, the administration probably need only consider, in good faith, a written submission from each affected faculty member setting out why he or she deserves to be retained."); *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985) (requiring "a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges"); *cf.* William A. Kaplin & Barbara A. Lee, *The Law of Higher Education* § 6.7.2.4 (5th ed. 2013) (same).

Jones's reliance on *Texas Faculty* and *Russell*—for the proposition that he was entitled to meet with President Webb—is misplaced. In *Texas Faculty*, the court repeatedly emphasized that the additional procedural safeguard mandated—a right to meet with the ultimate decision-maker if the terminated professor could make a "colorable showing" that he deserved to be retained in another academic program, 946 F.2d at 388—was dependent on the particular system of tenure at the university at issue. There, faculty were "tenured to their particular component *institution* rather than to a particular school or program within that institution." *Id.* at 386. By contrast, Jones's tenure was, according to ULS bylaws, "only within an academic discipline that is offered at

the institution and assures renewed appointments only within that discipline." To be sure, the ULS policy memorandum addressed to program discontinuance states that, upon the elimination of a tenured professor's program, "every reasonable effort will be made to find another suitable position for the faculty member within the university." But the "every reasonable effort" language falls far short of the commitment made by the university in *Texas Faculty*. *Texas Faculty*'s supplementary procedural protection—dependent as it was on a far more generous tenure scheme—is inapplicable here.

*Russell*, too, is inapposite. In that case, while the court explained that terminated faculty have "the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision," 736 F.2d at 289, the court reversed a grant of summary judgment because there was a genuine issue of material fact "as to whether plaintiffs were given the opportunity to rebut the reasons given for their termination at a hearing *or otherwise*." *Id.* at 290 (emphasis added). In other words, the reversal was because it was not clear whether there had been *any* opportunity for a hearing, not because there had been no opportunity to address the final decision-maker. This is the only reading that reconciles *Russell* with *Texas Faculty*, which provided that certain conditions be met before a hearing with the final decision-maker becomes compulsory. *See* 946 F.2d at 388. Consequently, Jones has not shown a deprivation of his procedural due process rights, and the district court properly granted summary judgment on this claim.

## IV. Substantive Due Process

Although Jones does not explicitly brief substantive due process, some of his claims sound there rather than in procedural due process. "Public officials violate substantive due process rights if they act arbitrarily or capriciously." *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562–63 (5th Cir. 2003). To

No. 14-31255

prove a substantive due process violation in this context, an employee must show that a public employer's decision "so lacked a basis in fact" that it could be said to have been made "without professional judgment." *Texas v. Walker*, 142 F.3d 813, 819 (5th Cir. 1998). The bar is high because "a federal court is generally not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Honore v. Douglas*, 833 F.2d 565, 569 (5th Cir. 1987) (citation omitted); *see also Bishop v. Wood*, 426 U.S. 341, 350 (1976) ("The Due Process Clause . . . is not a guarantee against incorrect or ill-advised personnel decisions."). The standard may be even more demanding in the context of higher education personnel decisions because of repeated refusals by the Supreme Court, as well as this court, to "use the Fourteenth Amendment as an excuse to regulate the internal affairs of public universities." *Tex. Faculty*, 946 F.2d at 385.

Jones's substantive due process arguments can be distilled into four key contentions. First, he argues that he was in fact tenured to the business administration program rather than to the economics concentration that was eliminated. Second, he maintains that he taught finance classes in the past, could have continued to teach those courses as a tenured professor, and could also have been selected to be the director of the school of business. Third, he asserts that non-tenured faculty were retained to teach the same courses he had previously taught. Finally, Jones argues that his termination was arbitrary because another professor was permitted to keep her tenure in similar circumstances.[8]

---

[8] Jones also argues that NSU lacked the authority to terminate him under its program discontinuance policy. This contention is undermined by the sizeable authority provided in the ULS bylaws. That "program discontinuance" was only added as an enumerated justification for tenure termination *after* Jones's termination, is irrelevant: the policy in place at the time contemplated for-cause termination for financial reasons, and also provided that the list of possible justifications "shall not be deemed exclusive." Some courts have even

No. 14-31255

Defendants argue that Jones was tenured to economics, and emphasize that once the economics concentration was eliminated there was no longer a position for him. They also maintain that he lacked credentials outside of economics. They emphasize the significant budget cuts that NSU faced and the faculty appeal committee's unanimous rejection of Jones's petition.

First, there is no evidence in the record to suggest that Jones was tenured to the business administration program. ULS bylaws provide that Jones was only tenured in his "discipline," which he admits was economics. He taught almost exclusively economics courses. And while it appears that the basic economics courses he taught continue to be taught by non-tenured faculty, it is equally clear that NSU administrators decided to deprioritize economics by offering fewer total economics courses and eliminating all economics programs. In the context of the serious budget crisis facing the university, we will not second-guess the good-faith decision-making that led to the elimination of the economics concentration or the complex reorganization of personnel and programs that followed. *See Honore*, 833 F.2d at 569 ("[A] federal court is generally not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."); *Wilson*, 2014 WL 1788283, at *9 ("This Court will not . . . function as a super personnel department as long as the minimum due process required was provided.").

Jones's next argument is essentially that NSU failed to find him a "suitable position." But the ULS policy for program discontinuance provides only that the university must make "every reasonable effort" to do so, and NSU did pass around Jones's name to "provosts and presidents from the other ULS

---

determined that there is an implied power to terminate tenured faculty for program discontinuance. *See Jimenez v. Almodovar*, 650 F.2d 363, 368 (1st Cir. 1981); Joseph G. Cook & John L. Sobieski Jr., *Civil Rights Actions* § 9.13[A] (2015).

universities." The university's adherence to its credentialing guidelines—which, in this context, required at least 18 hours of graduate courses in a discipline—was reasonable, and it was therefore not arbitrary to deny Jones (who indisputably lacked the requisite hours) a position teaching finance or any other non-economics business course. Jones's assertion that he was well-suited for the open director position at the College of Business—in light of the requirement that the candidate have experience teaching "modern computer technology" and the preference for candidates with "[a]dministrative experience"—is also unsupported: the record lacks evidence that he has experience in either area.

His third argument, that non-tenured faculty were retained in his place, falls short since the policy on which he relies requires only that non-tenured teachers be "*considered* for termination" before terminating teachers with tenure. Jones has failed to put forward any evidence that this did not take place. And in any case, retention of less senior employees is not inherently problematic. *See Russell*, 736 F.2d at 289 n.9 ("Testimony was introduced to establish that at the time plaintiffs were dismissed, employees with less seniority were retained. This alone, however, does not indicate that the plan allegedly employed by defendants was invalid."); *Bignall v. N. Idaho Coll.*, 538 F.2d 243, 250 (9th Cir. 1976).

Jones's final argument relates to the retention of another teacher, apparently with a degree in vocational education, to teach finance. Jones argues that NSU's willingness to transfer that teacher from the College of Education to the College of Business without terminating her tenure—and its unwillingness to permit him to retain his own tenure—shows that NSU acted arbitrarily. The record is extremely underdeveloped on this issue, as is Jones's argument. We are unwilling to say based on the evidence before us that the

retention of another professor to teach finance establishes the arbitrariness of NSU's decision to terminate Jones's tenure in economics.

Just as the budget crisis factored into the preceding procedural due process analysis, it must also be accounted for in the substantive due process analysis. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (explaining that conduct which might trigger a substantive due process violation in one circumstance might, "in other circumstances, and in the light of other considerations, fall short" (internal quotation marks and citation omitted)). NSU had a profoundly legitimate interest in preserving its fiscal integrity. Taking that interest into account, we conclude that Jones's substantive due process claims are without merit and that the district court appropriately granted summary judgment to Defendants on this issue.

## V. Contracts Clause

Jones's final claim is for a violation of the U.S. Constitution's Contracts Clause, which precludes states from "pass[ing] any . . . law impairing the obligation of contracts." U.S. Const. art. I, § 10, cl. 1. The district court did not address this claim other than to note that the court's due process analysis foreclosed it. Jones's challenge under the Contracts Clause appears to be a general challenge to the legislature's decision to reduce funding for public universities in the state during the recession.[9]

Where a state can provide a justification for the impairment that serves "a significant and legitimate public purpose"—and where the challenged law

---

[9] Although Jones conceded at oral argument that he did not sign a contract, we assume without deciding that the tenure bylaws resulted in a contractual relationship between him and NSU. *See Ind. ex rel. Anderson v. Brand*, 303 U.S. 95, 100 (1938) ("[I]t is established that a legislative enactment may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the State or its subdivisions within the protection of article 1, § 10." (citation omitted)). *But see* Kaplin & Lee, *The Law of Higher Education* § 6.2.2 ("[I]f there is no contract protecting the employees . . . the contracts clause is not at issue.").

No. 14-31255

was "reasonably necessary" to achieve an adequate purpose—the state does not violate the Contracts Clause. *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 627 (5th Cir. 2010). Importantly, Jones's argument on this issue does not relate to the circumstances of his particular termination; he traces his injury instead to the state of Louisiana's legislative decision to reduce funds to the ULS system. That decision served the legitimate state interest of addressing the grave economic crisis triggered by the Great Recession. *See Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983) (recognizing that "remedying . . . a broad and general social or economic problem" qualifies as a "significant and legitimate public purpose"). Jones provides no argument about how the budget reduction could have been more narrowly tailored to accomplish this legitimate purpose.

Additionally, there is no indication that the budget cuts were designed to provide "a benefit to a narrow group or special interest," which is why *Davis*, 602 F.3d at 631, on which Jones relies, is wholly distinguishable. Consequently, the district court properly granted summary judgment to Defendants on this claim.

## VI. Conclusion

We therefore AFFIRM the district court's grant of summary judgment to Defendants in all respects. In light of our resolution, we do not reach Defendants' prescription argument or the district court's decision on qualified immunity.