EWING WERLEIN, JR., UNITED STATES DISTRICT JUDGE
Pending is Plaintiff's Renewed Motion for Temporary Restraining Order (Document No. 16), which by agreement of the parties was converted to a motion for preliminary injunction. Plaintiff seeks preliminarily to enjoin the Secretary from acting pursuant to 42 U.S.C. §§ 1395g(a) and 1395ddd(f) to recoup from Plaintiff overpayments of Medicare funds paid to Plaintiff. The Court held an evidentiary hearing on the motion on October 31, 2018. After carefully considering the motion, response, supplemental response, advisory and response thereto, supplemental declaration,[1] arguments and evidence presented at the hearing, and applicable law, the Court concludes *590 for the reasons that follow that the motion should be denied.
I. Congress's Plan for Payment and Review of Claims Submitted by Medicare Service Providers
This case arises from Plaintiff Infinity Healthcare Services, Inc.'s ("Plaintiff") participation as a provider of home health services in the Medicare program. When Plaintiff applied to be certified as a Medicare provider, it agreed to be "legally and financially [bound] ... to the laws, regulations, and program instructions of the Medicare program."[2] Those laws and regulations establish that Medicare will pay for home health services only if a physician provides the detailed certification of the patient's eligibility described in 42 C.F.R. § 424.22. Such certification requires the physician to provide, inter alia , a narrative describing the clinical justification for certain services, certification that home health services are required because the patient is confined to the home, establishment of a plan for furnishing the services which was or will be reviewed periodically by a doctor, and certification of a face-to-face encounter with the patient. 42 C.F.R. § 424.22. This information must be recertified by a physician at least every sixty days when there is a need for continuous home health care, and a recertification must indicate the continuing need for services and estimate how much longer the services will be required. Id. Providers must certify on the appropriate billing forms submitted to Medicare that the required certification and recertification statements have been obtained and are on file. Id. § 424.11(a).
The Medicare laws and regulations to which Plaintiff agreed to be bound also include procedures for submitting claims for payment and appealing adverse payment decisions. Medicare providers like Plaintiff routinely submit claims for home health services which--in order to avoid delays in the provision of Medicare services to eligible patients--are paid as a matter of course within a couple of weeks. The structure therefore places an extraordinary level of trust in both the provider's integrity and its compliance with the required procedures. All payments, however, are subject to later review to determine whether the provider complied with Medicare's requirements.
To facilitate post-payment review of the provider's bills, Congress provided that the Secretary of the Department of Health and Human Services may enter into contracts with Medicare Administrative Contractors ("MACs") to determine the amount of payments to be made to providers and to communicate with the providers on behalf of the Secretary. 42 U.S.C. § 1395kk-1. A provider's claims which were initially paid as a matter of course may eventually be reviewed by a Zone Program Integrity Contractor ("ZPIC"), and if the ZPIC's audit determines that the provider was overpaid, the MAC sends the provider a letter demanding repayment. At that point, if the provider wishes to challenge the overpayment decision, Congress has provided a comprehensive multi-level administrative appeals process which the provider may pursue. The Fifth Circuit recently summarized this process:
First, [a provider] may submit to the MAC a claim for redetermination of the overpayment. 42 U.S.C. § 1395ff(a)(3)(A). Second, it may ask for reconsideration from a Qualified Independent Contractor ("QIC") hired by [the Centers for Medicare and Medicaid Services ("CMS") ] for that purpose. Id. § 1395ff(c), (g) ; 42 C.F.R. § 405.904(a)(2). If the QIC affirms the *591 MAC'S determination, the MAC may begin recouping the overpayment by garnishing future reimbursements otherwise due the provider. 42 U.S.C. § 1395ddd(f)(2) ; 42 C.F.R. § 405.371(a)(3).
Third, the provider may request de novo review before an ALJ within the Office of Medicare Hearings and Appeals (OMHA), an agency independent of CMS. 42 U.S.C. § 1395ff(d) ; 42 C.F.R. § 405.1000(d). The ALJ stage presents the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact. 42 C.F.R. § 405.1036(c) - (d). The ALJ "shall conduct and conclude a hearing ... and render a decision ... not later than" 90 days after a timely request. 42 U.S.C. § 1395ff(d)(1)(A). Fourth, the provider may appeal to the Medicare Appeals Council ("Council"),[3] an organization independent of both CMS and OMHA. 42 C.F.R. § 405.1100. The Council reviews the ALJ's decision de novo and is similarly required to issue a final decision within 90 days. Id. Furthermore, if the ALJ fails to issue a decision within 90 days, the provider may "escalate" the appeal to the Council, which will review the QIC's reconsideration. Id.
Family Rehab., Inc. v. Azar, 886 F.3d 496, 499-500 (5th Cir. 2018) (footnote omitted).
Each of these stages involves independent review by a new entity, and even the redetermination by the MAC must be undertaken by an individual who was not involved in the initial determination. See 42 C.F.R. § 4 05.948 ("A redetermination consists of an independent review of an initial determination.... An individual who was not involved in making the initial determination must make a redetermination.").
If at the end of this four-level administrative appeal process the provider is still unsatisfied, the final administrative decision is subject to judicial review in federal court. 42 U.S.C. § 1395ff(b)(1)(A). Additionally, Congress provided an option--referred to as "escalation"--for faster access to judicial review if the ALJ and the DAB do not provide decisions within the statutory deadlines. 42 U.S.C. § 1395ff(d)(3) (if the ALJ fails to meet its deadline, a provider may request review from the DAB, and if the DAB does not issue a decision within the statutory time frame, the provider may seek judicial review).
If Medicare's payments to a provider are determined to have been improper or overpaid, Medicare may recoup the overpayment by withholding payment on subsequent claims. 42 C.F.R. § 405.371(a) ("Medicare payments to providers ... may be ... (3) Offset or recouped, in whole or in part, by a Medicare contractor if the Medicare contractor or CMS has determined that the provider or supplier to whom payments are to be made has been overpaid."). Payments to a provider also may be suspended when there is reliable evidence of overpayment or a credible allegation of fraud. Id. ("Medicare payments to providers ... may be--(1) Suspended, in whole or in part, by CMS or a Medicare contractor if CMS or the Medicare contractor possesses reliable information that an overpayment exists or that the payments to be made may not be correct, although additional information may be needed for a determination; [or] (2) In *592 cases of suspected fraud, suspended, in whole or in part, by CMS or a Medicare contractor if CMS or the Medicare contractor has consulted with the OIG, and, as appropriate, the Department of Justice, and determined that a credible allegation of fraud exists against a provider or supplier, unless there is good cause not to suspend payments[.]").
When a provider seeks reconsideration of an overpayment decision, recoupment may begin after the QIC issues an unfavorable decision. 42 U.S.C. § 1395ddd(f)(2)(A). Congress also provided that a Medicare provider for whom recoupment of an overpayment presents a hardship may request an extended repayment plan, except that repayment plans are unavailable if the Secretary has reason to suspect that the provider may file for bankruptcy, cease to do business, or discontinue participation in the program, or if there is an indication of fraud or abuse committed against the program. Id. § 1395ddd(f)(1). If a provider obtains a favorable decision on appeal after recoupment has begun, it will receive the recouped funds with interest. Id. § 1395ddd(f)(2)(C).
II. Factual Background
The evidence in this case is largely uncontroverted as to what transpired, and the Court finds as follows. Plaintiff is a privately owned Houston business that in 2010 applied to be certified as a Medicare provider and agreed to be legally and financially bound to the Medicare laws and regulations outlined above. Plaintiff was certified as a Medicare provider in 2011. Plaintiff provides both home health care and hospice services, and at its peak had approximately thirty employees and sixty patients. In 2015, a Medicare ZPIC determined that Plaintiff had been overpaid for claims it had submitted, from which determination Plaintiff appealed and obtained a substantial reduction of the overpayment in 2016. Meanwhile, more recent payments were under review and in November 2016, either CMS or the Medicare contractor determined there was reliable evidence of overpayments or that payments may not be correct,[4] and all Medicare payments to Plaintiff were suspended pending a new overpayment investigation.
That investigation concluded in June 2017, when Palmetto GBA, LLC, a Medicare MAC, by letter dated June 27, 2017, notified Plaintiff that the ZPIC, Health Integrity, LLC, had determined an overpayment in the amount of $648,843. This overpayment determination was based on the ZPIC's review of a sample of thirty claims for payments submitted by Plaintiff and paid to Plaintiff for home health care services between August 2014 and July 2016. The ZPIC determined that twenty-nine of those thirty claims were defective and should not have been paid because Plaintiff had not submitted the required documentation to establish that the patients were eligible to receive home health care services or that Plaintiff had otherwise complied with Medicare's requirements. The ZPIC found an actual overpayment to Plaintiff of $65,256.23 based on those twenty-nine claims, and extrapolated a total overpayment of $648,843 during the relevant time period.
The MAC'S June 22nd notification letter included an attachment summarizing the reasons for the ZPIC's overpayment determination. Two of Plaintiff's claims were denied because Plaintiff did not supply records as requested, and the other twenty-seven *593 were denied because Plaintiff's documentation did not meet Medicare's criteria for home health services. Specific reasons for denial included: that there were no changes in the patient's condition or treatment regimen to support that services provided were so inherently complex that they could only be safely and effectively performed by, under the supervision of, or taught by a skilled nurse; that the documentation did not clearly support a determination of the patient's normal inability and considerable effort to leave home; that the face-to-face encounter documentation did not describe clinical observations of the patient to support the need for skilled services and contained only generalized statements to support the patient's homebound status; that the patient's plan of care was not signed and/or not dated by a physician; that OASIS documentation was incomplete or not included in the records; that the physical therapy evaluations of the patient did not describe the patient's restorative potential and how therapy services would be provided with the expectation that the patient's condition would improve materially in a reasonable and generally predictable period of time; and that the patient's physical therapy treatment plan was not signed and/or not dated by the physician.
Plaintiff on July 25, 2017, began the four-level Medicare appeals process by requesting a redetermination, arguing that its claims were properly presented and fully payable. Plaintiff was represented by counsel. Plaintiff's owner, Darlington Ofoefule, testified in the preliminary injunction hearing that Plaintiff at this first level of appeal submitted to the MAC all of the evidence that it had to support its argument that the overpayment determination was wrong. The MAC issued its redetermination decision in September 2017. The decision was completely "unfavorable" to Plaintiff. In the decision, the MAC reviewed and affirmed the statistical sampling methodology and devoted twenty pages to explaining the specific defects in each of the twenty-nine denied claims and outlining in detail numerous ways in which Plaintiff's documentation failed to comply with Medicare's requirements.[5]
Plaintiff then invoked the second stage of the appeal process by requesting an independent reconsideration by a QIC. Plaintiff again was represented by counsel and again submitted all evidence that Plaintiff had to support the validity of its claims. After reviewing all of Plaintiff's evidence, the QIC, C2C Innovative Solutions, Inc., rejected Plaintiff's arguments, and issued its "unfavorable" decision in April 2018. The QIC's decision included more than thirty-five pages of detailed explanation as to why each of the twenty-nine claims was overpaid and why Plaintiff's challenges to the notice it received and to the ZPIC's extrapolation methodology failed.[6] Given the unfavorable decision, the QIC also notified Plaintiff that recoupment would begin in late May, pursuant to 42 U.S.C. § 1395ddd(f)(2)(A).
Plaintiff's owner states that by then he had already reduced the company's operations due to its loss of revenue from Medicare's earlier payment suspension, and *594 that Plaintiff now has only eleven employees and six patients and will be forced to shut down completely sometime next year if recoupment is not suspended. Plaintiff did not request an extended repayment plan under 42 U.S.C. § 1395ddd(f)(1) because of its financial inability to make the required monthly payments even if they were extended over the maximum statutory term of five years.
As explained above, once a provider exhausts the first two levels of independent review by separate reviewing contractors, it may avail itself of a third level of administrative appeal by requesting a hearing before an administrative law judge ("ALJ"), who is to conduct a hearing and render a decision within 90 days after such a request is timely filed. See 42 U.S.C. § 1395ff(d)(1)(A). Currently there is a massive backlog within the Department of Health and Human Services that is causing delays of three to five years in the ALJ hearing process. The statute provides, however, that if the 90-day deadline is not met, the provider may escalate its claim to the fourth stage of the appeal process by requesting review from the DAB (Departmental Appeals Board). 42 U.S.C. § 1395ff(d)(3)(A). The DAB is to render its decision within a specified time, but if it fails to do so, the provider may bypass the DAB and seek judicial review in federal district court. Id. § 1395ff(d)(3)(B).[7]
Rather than to follow the steps provided by Congress to request an ALJ hearing and then, if such a hearing is not provided within 90 days, to escalate and proceed to federal court, Plaintiff filed this suit against Defendant Alex M. Azar II in his official capacity as Secretary of the United States Department of Health and Human Services ("Defendant"), seeking declaratory and injunctive relief to prevent Defendant from recouping the overpayment until after Plaintiff receives an ALJ hearing.[8] Plaintiff later requested an ALJ hearing on May 29, 2018, and then in June filed its First Amended Complaint, alleging that Plaintiff's statutory and constitutional due process rights have been violated and seeking suspension of recoupment until after Plaintiff receives an ALJ hearing, and also seeking mandamus relief prohibiting Defendant from using sampling to calculate Plaintiff's overpayment.[9] Plaintiff's request for an ex parte temporary restraining order was denied without prejudice to Plaintiff seeking expedited relief after serving Defendant.[10]
After Plaintiff served Defendant, Defendant moved to dismiss for lack of subject matter jurisdiction and Plaintiff filed a renewed motion for a temporary restraining order.[11] The Court dismissed Plaintiff's mandamus claim for lack of subject matter jurisdiction but otherwise denied Defendant's motion, holding that it has jurisdiction under the collateral-claims exception over Plaintiff's claims in Counts One through Four and Six, all of which challenge Defendant's right to recoup the overpayment without providing an ALJ hearing and decision within 90 days.[12] By *595 agreement of the parties, the Court converted Plaintiff's renewed motion for a temporary restraining order into a motion for preliminary injunction, which, after the evidentiary hearing held on October 31, is now ripe for decision.[13]
III. Legal Standard
To obtain a preliminary injunction Plaintiff must demonstrate: (1) a substantial likelihood that it will prevail on the merits, (2) a substantial threat that it will suffer irreparable injury if the relief is denied, (3) the harm to Plaintiff outweighs the threatened harm to Defendant, and (4) granting the injunction will not disserve the public interest. Bluefield Water Ass'n, Inc. v. City of Starkville, 577 F.3d 250, 252-53 (5th Cir. 2009). The Fifth Circuit "ha[s] cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." Id. at 253 (citing Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 195-96 (5th Cir. 2003) ).
IV. Discussion
A. Likelihood of Success on the Merits
Although Plaintiff alleges five live claims, Plaintiff conceded at the evidentiary hearing that essentially they are all one and the same, namely, a claim that Plaintiff is being denied constitutional due process by being subject to recoupment without receiving an ALJ hearing within the statutory time limit. Thus, to obtain a preliminary injunction to halt recoupment until it receives an ALJ hearing requires Plaintiff to prove a likelihood of success on its claim that an evidentiary hearing before an ALJ is constitutionally required before recoupment--not that the "outcome of those procedures will likely be favorable in a specific case." Family Rehab., 886 F.3d at 504 n.14.
In Family Rehab. the Fifth Circuit cited Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (which describes "the factors used to determine 'the specific dictates of due process' ") as the North Star to guide a district court in a case with similar facts. Family Rehab., 886 F.3d at 504 n.14. In Mathews, the seminal case on constitutional procedural due process, the plaintiff was a recipient of disability benefits who received a letter informing him of a tentative determination that his disability had ceased, giving a statement of reasons for the proposed termination of his Social Security benefits, and advising him that he could request reasonable time in which to submit additional information. 96 S.Ct. at 897. After receiving his written response, the state agency made its final determination that the plaintiff was no longer disabled and the Social Security Administration notified him that his benefits would terminate after that month. Id. at 897-98. Instead of requesting reconsideration, the plaintiff filed suit challenging the constitutionality of the administrative procedures and seeking immediate reinstatement of benefits pending an evidentiary hearing before an ALJ on the issue of his disability. Id. at 898.
The Supreme Court rejected the claim, holding that "an evidentiary hearing is not required prior to the termination of disability benefits and that the present administrative procedures fully comport with due process." Id. at 910. In reaching this conclusion, the Court explained that due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," but rather "is flexible *596 and calls for such procedural protections as the particular situation demands." 96 S.Ct. at 902 (citations omitted). The Court identified three relevant factors:
[o]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Id. at 903 (citation omitted); see also, e.g. , Jones v. La. Bd. of Sup'rs of Univ. of La. Sys., 809 F.3d 231, 236 (5th Cir. 2015) (reiterating that " Mathews provides the three distinct interests to consider" in evaluating whether procedural due process has been violated).
1. First Mathews Factor: The Private Interest that will be Affected by the Official Action
As to the first Mathews factor, Plaintiff "has a property interest in the Medicare payments for services rendered." Family Rehab., Inc. v. Azar, No. 17-CV-3008-K, 2018 WL 3155911, at *4 (N.D. Tex. June 28, 2018). Antithetically, Plaintiff does not "have a property interest in a level of benefits that is greater than Congress has provided." Sahara Health Care, Inc. v. Azar, No. 7:18-cv-203, 349 F.Supp.3d 555, 2018 WL 6073564 (S.D. Tex. Nov. 1, 2018), ECF No. 35, at 21 (quoting Greater Dallas Home Care All. v. United States. 10 F.Supp.2d 638, 646 (N.D. Tex. 1998) ); cf. also Pers. Care Prod., Inc. v. Hawkins, 635 F.3d 155, 159 (5th Cir. 2011) ("Nothing in Texas or federal law extends a property right in Medicaid reimbursements to a provider that is the subject of a fraud investigation."). Plaintiff's property interest is circumscribed by the merits of its claim to Medicare payments. Whether Plaintiff has or had not lawfully earned the Medicare payments it seeks to enjoin from recoupment is not up for determination in this proceeding, but only the narrow constitutional due process issue described above. To whatever extent Plaintiff ultimately is determined to be entitled to payment of the disputed claims, just as in Mathews, Plaintiff will be "awarded full retroactive relief if he ultimately prevails." Mathews, 96 S.Ct. at 905 ; see also 42 U.S.C. § 13 95ddd(f)(2)(C) (providing that one who prevails on appeal after recoupment has begun will receive the recouped funds with interest).
In considering the private interest at stake, Mathews instructs that "the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process." Id. at 906 (citation omitted). Thus, the Court explained that the termination of disability benefits, unlike the deprivation of welfare assistance, was not so severe a burden that the Constitution required a pre-deprivation hearing:
Only in [ Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ] has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation. It was emphasized there that welfare assistance is given to persons on the very margin of subsistence:
"The crucial factor in this context a factor not present in the case of ... virtually anyone else whose governmental entitlements are ended is that termination of aid pending resolution of a controversy over eligibility may *597 deprive an eligible recipient of the very means by which to live while he waits." 90 S.Ct. at 1018 (emphasis in original).
Eligibility for disability benefits, in contrast, is not based upon financial need.
...
[T]he hardship imposed upon the erroneously terminated disability recipient may be significant. Still, the disabled worker's need is likely to be less than that of a welfare recipient.
Mathews, 424 U.S. 319, 96 S.Ct. 893, 905-06, 47 L.Ed.2d 18 (1976) (footnotes and citations omitted). Here, the deprivation is much lesser still. Plaintiff is neither a welfare beneficiary nor a disability benefits recipient nor, for that matter, is it even an intended beneficiary of Medicare benefits. Instead, Plaintiff is a private corporation owned and operated by a businessman with a degree in business administration, which is a "mere incidental beneficiary," Nw. Healthcare, L.P. v. Sullivan. 793 F.Supp. 724, 727 (W.D. Tex. 1992), if it has lawfully provided home health services to patients who are Medicare's intended beneficiaries. Plaintiff's entitlement to Medicare payments for services provided is in no way based on financial need.[14] There is no evidence that Plaintiff's employees would be unable to find other employment if Plaintiff shuts down. Moreover, the uncontroverted evidence is that there are more than 450 other home health agencies in Harris County alone, and there is no evidence that any of Plaintiff's Medicare patients who are eligible for home health care would be unable to obtain care from the cornucopia of other local providers.
Nor does the length of the delay in the administrative appeal process indicate a severe deprivation. In Mathews, the Court found that no pre-deprivation hearing was constitutionally required where the delay between the cutoff of disability benefits and a final decision after an ALJ hearing would exceed one year. Id. at 906. Here, because of the Medicare backlog, Plaintiff faces a delay of three to five years before it could obtain an ALJ hearing. But Plaintiff need not endure that lengthy wait. As observed above, Plaintiff has the option of escalating its appeal to the DAB, and if the DAB does not provide a timely hearing, Plaintiff may pursue judicial review on the merits of its claims in federal court. 42 U.S.C. § 1395ff(d)(3). A provider who promptly pursues this option will be in federal court in less than a year after recoupment begins--shorter than the time for review that the Supreme Court considered acceptable in Mathews--even assuming that the ALJ and DAB both fail to provide an earlier decision. Although the adequacy of recourse to federal court has been questioned based on judicial review being deferential, see Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 191 (D.C. Cir. 2016), still the court has the power to determine whether the findings of Defendant are in fact supported by substantial evidence and, with respect to denials based on the claimant's failure to submit proof in conformity with any regulation, the court has authority to review both the claimant's conformity with such regulations and the validity of such regulations. 42 U.S.C. § 405(g). The court has "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the cause *598 for a rehearing." Id. [15]
Considering the nature of the deprivation, Plaintiff's private interest in the uninterrupted receipt of Medicare income pending further administrative review is significantly less compelling than the private interest of either the disability benefits recipient in Mathews or the welfare beneficiary in Goldberg. The first Mathews factor weighs against finding a violation of constitutional due process.
2. Second Mathews Factor: The Risk of an Erroneous Deprivation through the Procedures Used, and the Probable Value of Additional or Substitute Procedural Safeguards
The second Mathews factor focuses on the procedures themselves and possibility of error. Before recoupment began Plaintiff had completed two levels of administrative process (in addition to the ZPIC's initial overpayment determination) in which separate independent contractors determined--in lengthy written opinions explaining in detail the reasons for their denials--that Plaintiff was not entitled to payment for a portion of the claims it filed.[16] Throughout those procedures, Plaintiff was represented by counsel. Everything, all of Plaintiff's evidence, was required to be presented in support of its appeal. See 42 C.F.R. § 405.946(a) ("When filing the request for redetermination, a party must explain why it disagrees with the contractor's determination and should include any evidence that the party believes should be considered by the contractor in making its redetermination."); 42 C.F.R. § 405.966(a) ("When filing a request for reconsideration, a party should present evidence and allegations of fact or law related to the issue in dispute and explain why it disagrees with the initial determination, including the redetermination. (1) This evidence must include any missing documentation identified in the notice of redetermination, consistent with § 405.956(b)(6). (2) Absent good cause, failure to submit all evidence, including documentation requested in the notice of redetermination prior to the issuance of the notice of reconsideration precludes subsequent consideration of that evidence.").
This is significantly more process than the plaintiff in Mathews received before his Social Security disability benefits were terminated, and yet the Supreme Court held that due process was satisfied and no evidentiary hearing was required before that deprivation. In reaching that conclusion, the Court emphasized that "the information critical to the entitlement decision usually is derived from medical sources, such as the treating physician. Such sources are likely to be able to communicate more effectively through written documents than are welfare recipients or the lay witnesses supporting their cause. The *599 conclusions of physicians often are supported by X-rays and the results of clinical or laboratory tests, information typically more amenable to written than to oral presentation," Mathews, 96 S.Ct. at 908, such that an evidentiary hearing would provide limited added value. See also id. at 907 ("Central to the evaluation of any administrative process is the nature of the relevant inquiry.") (citations omitted).
Here, the nature of the evidence received to determine whether Medicare patients are eligible to receive Medicare home health services is strikingly comparable to that in Mathews. Plaintiff's claims were denied predominantly because of missing or incomplete documentation certifying that a physician has verified that the patient meets Medicare's eligibility requirements for home health care. See 42 C.F.R. § 424.22(c) ("If the documentation used as the basis for the certification of eligibility is not sufficient to demonstrate that the patient is or was eligible to receive services under the Medicare home health benefit, payment will not be rendered for home health services provided."). As stated above, such certification requires the physician to furnish, inter alia , a narrative describing the clinical justification for certain services, certification that home health services are required because the patient is confined to the home, establishment of a plan for furnishing the services which was or will be reviewed periodically by a doctor, and certification of a face-to-face encounter with the patient. Id. § 424.22(a). This evidence is entirely documentary and consists of records produced by and within the control of Plaintiff. Moreover, Plaintiff had the opportunity at both the redetermination and reconsideration levels "to submit additional evidence or arguments, enabling [Plaintiff] to challenge directly the accuracy of information in [its] file as well as the correctness of the agency's tentative conclusions," such that an oral hearing is not vital. Mathews, 96 S.Ct. at 908. Exactly like Mathews, here the physicians' narratives, certifications, reviews of treatment plans and the like are all "information typically more amenable to written than to oral presentation." Id. Likewise, there is a sharp contrast between the Plaintiff commercial health care provider here, assisted by experienced counsel, and the welfare recipient in Goldberg for whom due process did require an evidentiary hearing. Cf. Goldberg, 90 S.Ct. at 1021 ("Written submissions are an unrealistic option for most [welfare] recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance."). Indeed, Plaintiff has offered no plausible explanation why a live evidentiary hearing is necessary or helpful to present documentary evidence proving that the services for which it billed and collected payments from Medicare are in fact supported by the documentation required by Medicare.[17] As in Mathews, "[t]he potential value of an evidentiary hearing, or even oral presentation to the decisionmaker, is substantially less in this context than in Goldberg." Mathews, 96 S.Ct. at 907.
The marginal value of an evidentiary hearing is even more attenuated in light of the two independent contractors' reviews already conducted and the requirement *600 that Plaintiff produce all of its evidence at the first two stages of the appeal process. As observed above, these first two stages provided adequate process for Plaintiff in 2015 and 2016 when it successfully appealed the ZPIC's determination of an extrapolated overpayment of approximately $1 million and obtained a reduction to approximately $110,000 without reaching the ALJ stage. Furthermore, as discussed in more detail below, Congress specifically expected that ALJ decisions would not always be timely and created a remedy, allowing providers to elect to escalate their claims past the ALJ stage if they so desired. It is reasonable to infer that Congress did not view an ALJ hearing before recoupment as indispensable for protecting providers' rights.
The specific facts of this case further undercut Plaintiff's contention that an ALJ hearing would provide a unique opportunity for it to present new evidence. Plaintiff's owner, Darlington Ofoefule, testified that Plaintiff has already produced all evidence it has in support of its claims at the prior hearings. Plaintiff does not contend that it lacked notice of the asserted deficiencies in its documentation before its appeal to the QIC so as to be unable to prepare and present evidence to rebut those deficiencies, and the evidence is to the contrary. Although Ofoefule testified that he might want to procure additional letters from doctors and hire an expert to testify at the ALJ hearing, Plaintiff presented no evidence that it had any plausible excuse, much less good cause, not to have obtained its hoped-for additional proof during the sixteen and a half months after it was first notified of the overpayment, or during the ten months when Plaintiff with the assistance of experienced counsel appealed through two detailed levels of administrative review. Having no good cause for not having gathered and submitted to the MAC and/or the QIC any additional evidence, it is now too late to introduce new evidence even if Plaintiff were given an immediate ALJ hearing. See 42 U.S.C. § 1395ff(b)(3) (provider "may not introduce evidence in any appeal ... that was not presented at the reconsideration conducted by the [QIC], unless there is good cause which precluded the introduction of such evidence at or before that reconsideration").[18]
Additionally, the uncontroverted evidence is that in fiscal year 2018, only 18.2 percent of appellants received a fully or partially favorable ruling at the ALJ stage. Ignoring the large percentage of appeals *601 that were dismissed and looking only at the appeals decided on the merits, fewer than half of those appellants obtained a fully or partially favorable ruling. This is a lower reversal rate than in the ALJ hearings that the Supreme Court in Mathews determined were not required before termination of disability benefits. See Mathews, 96 S.Ct. at 908 (noting reversal rate of 58.6% for appealed reconsideration decisions but explaining that "[b]are statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process").
In sum, Plaintiff has enjoyed procedural due process and protections much greater than those available to the disability benefits recipient in Mathews. Under the second Mathews factor, Plaintiff has failed to establish that the procedures to which Plaintiff availed itself present the kind of risk of an erroneous deprivation such that additional procedural safeguards are needed to prevent a constitutional due process violation.
3. Third Mathews Factor: The Government's Interest, Including the Function Involved and the Fiscal and Administrative Burdens that the Additional or Substitute Procedural Requirement Would Entail
Turning to the final Mathews factor, the Government's sizeable fiscal and administrative burdens are essentially incalculable if constitutional due process is construed to compel a third level of administrative review by an ALJ before recoupment of overpayments is permitted. See Mathews, 96 S.Ct. at 909 ("The most visible burden would be the incremental cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision.... [E]xperience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial."). Here, the parties did not prove the number of appeals awaiting ALJ hearings but it is undisputed that the number is at least in the hundreds of thousands. Obviously, to dispose of this backlog and decide ALJ cases within 90 days would require vast numbers of additional ALJs together with appropriate support staffs, which, if feasible at all, would come with enormous costs to the Government and the public. On the other hand, if the backlog persists, the costs of making continued payments for an additional three to five years to hundreds of thousands of providers that have been determined by multiple independent reviews to have been overpaid, with little hope of later recovering the overpayment, would likewise be enormous. Either way, the Supreme Court in Mathews found that such costs must be weighed in the balance:
Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision. But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited.
Id. Just as in Mathews, if recoupment is suspended and Plaintiff continues to bill for services that Defendant routinely pays within two weeks or less in reliance on the *602 trust system that is the underpinning of Medicare, Defendant's "theoretical right" to recover overpayments after an ALJ hearing is unlikely to "result, as a practical matter, in any substantial offset to the added outlay of public funds," ids="12026449" index="61" url="https://cite.case.law/us/424/319/">id., and the funds available to pay for medical care for eligible Medicare patients will be reduced accordingly.[19]
Like the plaintiff in Mathews, Plaintiff has not shown that after two levels of separate and independent reviews the Constitution now require an ALJ hearing in order to permit Defendant to recoup its overpayment. Indeed, Plaintiff conceded at oral argument that if Congress had written the statute to provide for only the first two levels of the administrative appeal process that Plaintiff exhausted, followed by the judicial review, there would be no unconstitutional deprivation of due process. Plaintiff's concession that due process is satisfied even if Congress had not provided an ALJ hearing is fully consistent with Matthews. Plaintiff has made no plausible showing of how it suffers a deprivation of due process simply because Congress added to a constitutionally adequate process additional layers of procedural process (including an ALJ hearing) which Plaintiff may elect either to await or to bypass by escalation if it chooses to avoid the delays caused by the backlogs. Accordingly, after careful consideration of all three Mathews factors, it is evident that Plaintiff has not met its burden to show a substantial likelihood of success on the merits of its claim that constitutional due process requires Defendant to provide an ALJ hearing before continuing to recoup the overpayment to Plaintiff.
4. Other Considerations regarding Likelihood of Success on the Merits
Whether Defendant's actions violate statutory requirements and whether they violate the Constitution are two distinct questions. In light of Plaintiff's concession that the Constitution does not require an ALJ hearing at all, Plaintiff's claims perhaps are better construed as statutory, rather than constitutional, challenges. However, Plaintiff has not shown that it is statutorily entitled to suspension of recoupment because an ALJ hearing cannot be accomplished within the 90-day deadline. Indeed, Congress specifically contemplated this possibility and provided a different remedy as part of its comprehensive statutory scheme, as the Fourth Circuit has persuasively explained:
While the [Medicare] statute imposes deadlines for completion at each step of the process, it also anticipates that the deadlines may not be met and thus gives the healthcare provider the option of bypassing each step and escalating the claim to the next level, ultimately reaching judicial review by a United States district court within a relatively prompt time.
Cumberland Cty. Hosp. Sys., Inc. v. Burwell, 816 F.3d 48, 54 (4th Cir. 2016). The Fourth Circuit explained that the Medicare Act did set a 90-day deadline for ALJ hearings in mandatory language, but that Congress in the same statute also provided the answer for "what consequences follow if the deadline is not met." Id. at 54-55 *603 (quoting 42 U.S.C. § 1395ff(d)(3)(A) ("In the case of a failure by an administrative law judge to render a decision by the end of the period described in paragraph (1), the party requesting the hearing may request a review by the Departmental Appeals Board of the Department of Health and Human Services, notwithstanding any requirements for a hearing for purposes of the party's right to such a review.") ).
Consequently, instead of creating a right to go to court to enforce the 90-day deadline, Congress specifically gave the healthcare provider a choice of either waiting for the ALJ hearing beyond the 90-day deadline or continuing within the administrative process by escalation to the next level of review. The Hospital System's argument focuses on only the provision creating the 90-day time frame and fails to account for its context in the comprehensive administrative process. Our reading of the statute cannot be so restricted. See King v. Burwell, --- U.S. ----, 135 S.Ct. 2480, 2492, 192 L.Ed.2d 483 (2015) (noting that it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting Util. Air Regulatory Grp. v. EPA, 573 U.S. 302, 134 S.Ct. 2427, 2441, 189 L.Ed.2d 372 (2014) (internal quotation marks omitted) ) ); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (noting that "a reviewing court should not confine itself to examining a particular statutory provision in isolation").
Thus, when taken in context, § 1395ff(d) must be understood to provide a 90-day deadline for an ALJ's decision, thereby encouraging the process to proceed expeditiously, and to give the healthcare provider two options if the deadline is not met: bypassing the ALJ hearing and obtaining review by the Departmental Appeals Board, or waiting beyond the 90-day period for the ALJ to conduct a hearing and render a decision. In giving the healthcare provider these options, Congress anticipated that the 90-day deadline might not be met and provided its chosen remedy.
Id. at 55 ; accord Ivanchenko v. Burwell, No. 16 C 9056, 2016 WL 6995570, at *6 (N.D. Ill. Nov. 30, 2016) ("[T]he Medicare Act not only provides a four-level appeals process, but also provides a process for claimants to escalate their claims to the district court if their appeal is not decided within the period outlined in the Medicare Act. Although escalating a claim to the DAB and then potentially proceeding in federal court is not identical to proceeding before an ALJ, it is an alternative and adequate avenue of relief, and it is an avenue of relief that Plaintiffs have not yet taken advantage of. Furthermore, and as described above, due to the available option of escalating their administrative appeal, Plaintiffs do not have a 'clear right' to an ALJ decision within 90 days of receiving a request for an appeal.") (citing Cumberland Cty. Hosp. Sys., 816 F.3d at 55-56 ); but see Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 192 (D.C. Cir. 2016) (holding the Secretary has a "clear duty" to comply with the statutory deadlines and that escalation is an inadequate alternative).
Plaintiff cites no binding authority holding that Defendant's failure to provide an ALJ hearing within 90 days entitles Plaintiff to suspension of recoupment rather than to the statutory remedies Congress provided in 42 U.S.C. § 1395ff(d)(3), which it unambiguously titled "Consequences of failure to meet deadlines." As discussed above, those statutory remedies--to which Plaintiff agreed to be bound when it applied to be a Medicare provider--fully comply with constitutional due process under the controlling authority of Mathews.
*604 Family Rehab., 886 F.3d at 504 n.14 ; cf. also Mathews, 96 S.Ct. at 909-10 ("In assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals. This is especially so where, as here, the prescribed procedures not only provide the claimant with an effective process for asserting his claim prior to any administrative action, but also assure a right to an evidentiary hearing, as well as to subsequent judicial review, before the denial of his claim becomes final.") (internal citations omitted). Finally, Congress provided for recoupment to begin on the date that the QIC issues an unfavorable decision, before an ALJ hearing would be completed even in the absence of an agency backlog. 42 U.S.C. § 1395ddd(f)(2)(A). Accordingly, Plaintiff has not established either a constitutional or a statutory entitlement to suspension of recoupment.[20]
B. Other Preliminary Injunction Factors
Even if Plaintiff could establish a substantial likelihood of success on the merits, Plaintiff is not entitled to an injunction based on the other factors. While the harm to Plaintiff will be irreparable if it elects to continue acting only as a Medicare provider while awaiting an ALJ hearing and therefore goes out of business, such harm is outweighed by the harm to Defendant and to the public interest in requiring Defendant to continue making payments to Plaintiff for years with no realistic hope of recouping any of its overpayments in the event that an ALJ ultimately reaches the same conclusion as the ZPIC, MAC, and QIC. Cf. Nw. Healthcare, L.P. v. Sullivan, 793 F.Supp. 724, 727-28 (W.D. Tex. 1992) ("While Bayou Glen as an entity may cease to exist if no pre-termination hearing is held, its employees and patients will not be deprived of a means of living and the 'death' of a corporation does not warrant the degree of protection required for a welfare recipient, or even a disability recipient. This is especially true since patients receiving Medicare or Medicaid benefits are the intended beneficiaries, and Bayou Glen a mere incidental beneficiary. Furthermore, the government's interest in conserving scarce resources and protecting Medicare and Medicaid recipients is much stronger than the financial interest of a corporation.") (citing Mathews, 96 S.Ct. at 909 ; Americana Healthcare Corp. v. Schweiker, 688 F.2d 1072, 1083 (7th Cir. 1982) ). The uncontroverted evidence is that there are more than 450 other home health agencies in Harris County alone, so Plaintiff's remaining six patients if eligible for Medicare-provided home health care should have no difficulty finding a new care provider. Finally, Plaintiff in order to be permitted to participate as a Medicare provider agreed to be "legally and financially [bound] ... to the laws, regulations, and program instructions of the Medicare program," which include the recoupment provisions and the statutory remedies Congress provided *605 in the event that an ALJ hearing was not provided within 90 days.[21] Plaintiff has not shown that its forsaking this agreement and obtaining a preliminary injunction to thwart the comprehensive statutory plan enacted by Congress would serve the public interest. Indeed, it would not. Accordingly, Plaintiff has not " 'clearly carried the burden of persuasion' on all four requirements" so as to be entitled to the "extraordinary remedy" of a preliminary injunction. Bluefield Water Ass'n, 577 F.3d at 253.
V. Order
It is therefore
ORDERED that Plaintiff's Renewed Motion for Temporary Restraining Order (Document No. 16), which by agreement of the parties was converted to a motion for preliminary injunction, is DENIED.

Plaintiff's Opposed Motion for Leave to File Supplemental Declaration (Document No. 33) is GRANTED.

Document No. 24-1 at 25 of 27.

The regulations refer to review by the Medicare Appeals Council while the corresponding statutes refer to review by the Departmental Appeals Board ("DAB"). The Medicare Appeals Council is part of the DAB. See 42 C.F.R. § 405.370(b) ("Medicare Appeals Council means the council within the Departmental Appeals Board of the U.S. Department of Health and Human Services.").

New Medicare payments may also be suspended, as observed above, in cases of suspected fraud.

Document No. 28-3. This Court has jurisdiction only over Plaintiff's collateral claims challenging the administrative appeal process , and expresses no opinion on the correctness of the various administrative decisions on the merits of Plaintiff's underlying claims described in this opinion. See Family Rehab., 886 F.3d at 503 ("If the court must examine the merits of the underlying dispute, delve into the statute and regulations, or make independent judgments as to plaintiffs' eligibility under a statute, the claim is not collateral.") (citations omitted).

Document No. 28-5.

The DAB ordinarily must make a decision or remand to the ALJ within 90 days of a provider's request for review, 42 U.S.C. § 1395ff(d)(2)(A), but when the provider has skipped awaiting an ALJ decision and escalated to the DAB, the DAB's deadline is extended to 180 days. 42 C.F.R. § 405.1100(d).

Document No. 1 (Compl.).

Document No. 4 (1st Am. Compl.).

Document No. 6.

Document Nos. 9, 16.

Document No. 26. The Court's earlier Memorandum and Order misstated the statute pertaining to the collateral-claims exception over Plaintiff's claims in Counts One, Two, Three, Four, and Six. Id. at 8 (emphasis added). The correct statutory jurisdictional reference is 42 U.S.C. § 405. See Family Rehab., 886 F.3d at 501-05.

Document Nos. 25, 30.

Presumably Plaintiff with a different business plan would be able to earn income from sources other than Medicare but, regardless, sympathy for this provider staying in this business is not a reasonable consideration in deciding the narrow due process claim at issue.

Regardless, and staying focused on the limited issue now to be decided, the question remains whether after two levels of independent review, more than in Mathews, there is a constitutional due process violation under Mathews when recoupment begins when Congress authorized it.

Unlike the Recovery Audit Contractors discussed in some Medicare cases, which receive payments on a contingency fee basis tied to the money they recover by denying claims (and are claimed to be the cause of the huge ALJ backlog), the independent contractors that conducted these reviews of Plaintiff's claims have no contingency interests or financial incentives to find overpayments. Cf. Cumberland Cty. Hosp. Sys., Inc. v. Burwell, 816 F.3d 48, 51 (4th Cir. 2016) ("[T]he Hospital System contends that the increase in appeals from audits conducted pursuant to the Recovery Audit Program is attributable to the perverse incentives of that program, which pays contractors contingency compensation based on monies they recover in denying improper or excessive claims.").

To the extent that Plaintiff seeks to challenge not only the specific overpayments already determined by the ZPIC, MAC, and QIC, but also the extrapolation methodology used to find a larger total overpayment, Plaintiff produces no evidence that its arguments about proper extrapolation methodology could not be adequately presented in writing and would be materially advanced by an evidentiary hearing. In fact, Plaintiff succeeded in its previous challenge to the extrapolation used in an overpayment determination without an evidentiary hearing before an ALJ.

After the preliminary injunction hearing, Plaintiff filed a supplemental declaration in which Ofoefule conclusorily testifies that "there will be experts to testify as to the validity of the claims and that the extrapolation methodology was flawed" and that the experts will submit a report before the ALJ hearing. Document No. 33-2. Ofoefule's representation neither specifies the expected content of the experts' opinions nor, more importantly, shows any good cause that would allow the ALJ to consider this evidence.
Ofoefule also cites to 42 C.F.R. § 405.1018(d), which he argues allows him to submit new oral testimony at an ALJ hearing. That regulation provides a deadline for submitting evidence to the ALJ and requires that any evidence not submitted prior to the issuance of the QIC's reconsideration determination must be accompanied by a statement explaining why the evidence was not previously submitted to the QIC or a prior decision-maker, and then provides that the regulation does not apply, inter alia , to oral testimony. 42 C.F.R. § 405.1018. It is not clear that the exception in the regulation is intended also to apply to the statutory prohibition on introducing new evidence without good cause, which contains no exception for oral testimony. See 42 U.S.C. § 1395ff(b)(3). At the very least, the good cause requirement applies to the proposed doctors' letters that Ofoefule testified he wanted to obtain, and to the written expert report(s) that he stated in his supplemental declaration would be submitted.

The Court takes judicial notice of the Government Accountability Office's May 2018 report to Congress on improper payments, which estimated that the Department of Health and Human Services paid nearly $90 billion on improper Medicare and Medicaid claims in fiscal year 2017 alone. U.S. Gov't Accountability Office, GAO-18-377, Improper Payments: Actions and Guidance Could Help Address Issues and Inconsistencies in Estimation Processes (2018). This enormous loss is more than twice the amount of the National Institute of Health's annual medical research funding of approximately $37 billion.

The Court respectfully notes that other district judges within the Fifth Circuit are divided in their rulings on whether to grant preliminary injunctions to halt recoupments in similar cases. Compare Sahara Health Care, Inc. v. Azar, No. 7:18-cv-203 (S.D. Tex. Nov. 1, 2018), ECF No. 35 (denying injunction and dismissing procedural due process claim on the merits for failure to state a claim), with Adams EMS, Inc. v. Azar, No. CV H-18-1443, 2018 WL 5264244 (S.D. Tex. Oct. 23, 2018) (granting injunction); Han Ma Eum, Inc. v. Azar, No. 4:18-CV-2946 (S.D. Tex. Sep. 26, 2018), ECF No. 18 (same); Family Rehab., Inc. v. Azar, No. 3:17-CV-3008-K, 2018 WL 3155911, at *7 (N.D. Tex. June 28, 2018) (same).

Document No. 24-1 at 25 of 27.